John E. JOHNSON and h/w Ann Marie Johnson, Plaintiffs–Appellees,

v.

The CELOTEX CORPORATION, Owens–Illinois, Inc., Defendants–Appellants.

Nos. 341, 342, Dockets 89–7484, 89–7542.

United States Court of Appeals, Second Circuit.

Argued Nov. 2, 1989.

Decided March 20, 1990.

Steven J. Phillips, New York City (Levy Phillips & Konigsberg, Diane Paolicelli, New York City, of counsel), for plaintiffs-appellees.

Andrew T. Berry, Newark, N.J. (McCarter & English, Newark, N.J., of counsel), for defendant-appellant, Celotex Corp.

Frank H. Santoro, Hartford, Conn. (Danaher, Tedford, Lagnese & Neal, P.C., Joyce A. Lagnese, Paul J. Narducci, and Wendy W. Wanchak, Hartford, Conn., of counsel), for defendant-appellant, Owens–Illinois, Inc.

Before MINER and MAHONEY, Circuit Judges, and CARMAN, Judge.*

CARMAN, Judge:

Defendant-appellant The Celotex Corporation (Celotex or appellant) appeals from a judgment entered in the Southern District of New York after a jury trial before Charles P. Sifton, J., regarding Joint Eastern and Southern Districts Asbestos Litigation, awarding compensatory and punitive damages and damages for loss of consortium in an asbestos products liability personal injury case. Celotex appeals from orders denying its motion for judgment notwithstanding the verdict, or in the alternative, a new trial and for a mistrial. Defendant-appellant, Owens–Illinois, Inc. (Owens–Illinois or appellant) appeals from the same judgment and orders denying its mo-

---

* Honorable Gregory W. Carman, Judge, United States Court of International Trade, sitting by designation.

tion for judgment notwithstanding the verdict and its motion for a new trial or, in the alternative, for a remittitur.

Appellants request us to reverse the judgment below or, in the alternative, vacate the judgment and remand for a new trial. In the alternative, appellants ask us to vacate the punitive damages award and remand for a new trial on the issue of punitive damages.

## BACKGROUND

This appeal is one of many which arises from thousands of cases filed against manufacturers and producers of asbestos, resulting in unparalleled litigation in American tort law. *See Racich v. Celotex Corp.*, 887 F.2d 393, 394 (2d Cir.1989); *In re School Asbestos Litigation*, 789 F.2d 996, 1000 (3d Cir.), *cert. denied*, 479 U.S. 852, 107 S.Ct. 182, 93 L.Ed.2d 117 (1986). The cases have been filed pursuant to New York's one-year revival statute for certain toxic torts, including alleged asbestos related torts, 1986 N.Y.Laws, ch. 682, § 4. To manage the litigation, all of the cases in the Southern and Eastern Districts were assigned for pre-trial purposes to Judge Sifton. *Racich*, 887 F.2d at 395.

At a pretrial conference on November 4, 1988, the court proposed that another asbestos tort case, *Higgins v. Raymark Industries, Inc.*, CV–87–0537 (S.D.N.Y.), be consolidated with *Johnson* which was scheduled for trial on November 7, 1988. The trial court ordered on November 7, 1988 that *Higgins* and *Johnson* be consolidated for trial. Plaintiff Higgins, a chipper and caulker, whose work included chipping off welded sections to prepare for repair work of others, was alleged to have died because of exposure to asbestos while at the Brooklyn Navy Yard from approximately 1946 to 1966. Appellee-plaintiff, John Johnson (plaintiff), an electrician's helper, alleged that he had contracted lung disease while working at the Brooklyn Navy Yard from 1942 to 1945 by inhaling asbestos fibers during this employment.

In *Johnson* and *Higgins* compensatory and punitive damages were sought for claims sounding in negligence and strict liability for defendants' failure to warn of the health risks of their asbestos-containing products.

The Court declined to trifurcate or bifurcate the trial to separate issues of causation and compensatory damages from issues of liability and punitive damages. Appellants' motions to have separate juries consider claims of liability and punitive damages in *Johnson*, apart from claims in *Higgins*, were denied. Appellants' motion to preclude all evidence of knowledge post–1945 in relation to plaintiff Johnson was denied. Eight defendants settled and one filed a petition in bankruptcy prior to trial. The *Higgins* and *Johnson* cases proceeded to trial against defendants Celotex, Owens–Illinois and Raymark Industries, Inc. (Raymark). The jury rendered a verdict for the plaintiffs in both cases. In *Higgins*, plaintiff was awarded $1 million in compensatory damages and $3 million in punitive damages, divided equally among Celotex, Raymark and Owens–Illinois. In *Johnson* compensatory damages were $350,000 (Celotex 12.5%, Raymark 12.5%, Owens–Illinois 5.0%, seven settling co-defendants 10% each), and punitive damages were assessed as follows: Celotex $1 million, Raymark $1 million and Owens–Illinois $800,000. Plaintiff Ann Marie Johnson was awarded $30,000 for loss of services.

After the verdict, but before entry of judgment, it was discovered that Celotex had never been named or served as a defendant in the *Higgins* case. Further, since Florida was the principal place of business of Celotex and the residence of plaintiff in *Higgins*, the trial court determined there was lack of diversity as to Celotex.

In response to post-trial motions the Court ordered an amendment to the pleadings to add Celotex as a party-defendant pursuant to Rule 15(b) of the Federal Rules of Civil Procedure. The Court then dismissed the complaint in the *Higgins* case as to Celotex for lack of jurisdiction and retained its diversity jurisdiction over defendants Raymark and Owens–Illinois. A subsequent bankruptcy proceeding has stayed this case with regard to Raymark.

## FACTS

Plaintiff John Johnson, an employee of the United States Navy, worked as an electrician's helper at the Brooklyn Navy Yard from 1942 to 1945. The Brooklyn Navy Yard covered an area of about three miles and in the entire yard there were approximately 20 ships under construction or repair. He installed electrical wiring in new and older ships. Although Johnson did not work with any product that he knew contained asbestos, he worked in the vicinity of other tradespeople who installed asbestos insulation material on ships. Johnson could not identify by name any workers in his vicinity or the trade name or manufacturer of any asbestos materials used at the shipyard. Johnson recalled working on destroyers, battleships and in particular remembered working on the *Iowa*, the *Missouri* and the *Franklin* at the yard. He testified that his work area was always dusty and that he would brush off a very fine snow-like dust that accumulated on his clothes.

Product identification testimony was based upon the testimony of other workers employed at the Navy Yard at approximately the same time as Johnson. The co-workers identified over a dozen makers of asbestos-containing products used at the Navy Yard at different times.

In 1945, Johnson left the Navy Yard and was not later exposed to any other asbestos containing products. In 1985, after retirement, Johnson was diagnosed with a lung condition which was attributed to asbestos exposure.

## CONTENTIONS OF THE PARTIES

Appellants contend the trial court abused its discretion in consolidating the *Johnson* and *Higgins* cases. They further urge the connection with plaintiff's injury and appellants' products was insufficient as a matter of law. As to the issue of punitive damages, appellants maintain the Fourteenth Amendment bars an award of punitive damages because appellants have been subjected to repeated punitive damages for the same course of conduct. They also claim procedural due process violations and con-

tend that the punitive damages were not supported by the evidence as a matter of law. Lastly, appellants claim the improper conduct of the trial court together with inflammatory conduct by counsel for plaintiff and improper rulings allowed the jury to hear evidence that should not have been heard, all resulting in a verdict which was the result of pressure and prejudice and which should be revised.

Appellants seek reversal of the judgment, or in the alternative, request that the judgment be vacated and the case be remanded for a new trial as to all issues. Celotex requests that in the alternative, the punitive damage award should be vacated and the case remanded on the issue of punitive damages. Plaintiff seeks affirmance of the judgment below.

## DISCUSSION

### Consolidation

Rule 42(a) of the Federal Rules of Civil Procedure empowers a trial judge to consolidate actions for trial when there are common questions of law or fact to avoid unnecessary costs or delay. *Ellerman Lines, Ltd. v. Atlantic & Gulf Stevedores, Inc.*, 339 F.2d 673 (3d Cir.1964), *cert. denied*, 382 U.S. 812, 86 S.Ct. 23, 15 L.Ed.2d 60 (1965); *Zervos v. S.S. Sam Houston*, 427 F.Supp. 500 (S.D.N.Y.1976), *aff'd*, 636 F.2d 1202 (2d Cir.1980).

Consolidation of tort actions sharing common questions of law and fact is commonplace. *See, e.g., Arnold v. Eastern Air Lines, Inc.*, 681 F.2d 186 (4th Cir.1982), *cert. denied*, 460 U.S. 1102, 103 S.Ct. 1801, 76 L.Ed.2d 366 (1983); *Kershaw v. Sterling Drug, Inc.*, 415 F.2d 1009 (5th Cir.1969). This is true of asbestos-related personal injury cases as well. *See, e.g., Hendrix v. Raybestos–Manhattan, Inc.*, 776 F.2d 1492 (11th Cir.1985); *Neal v. Carey Canadian Mines, Ltd.*, 548 F.Supp. 357 (E.D.Pa.1982), *aff'd sub nom. Van Buskirk v. Carey Canadian Mines, Ltd.*, 760 F.2d 481 (3d Cir.1985); *Wilson v. Johns–Manville Sales Corp.*, 107 F.R.D. 250 (S.D.Tex.1985).

The trial court has broad discretion to determine whether consolidation is appro-

priate. *See, e.g., Midwest Community Council, Inc. v. Chicago Park Dist.*, 98 F.R.D. 491 (N.D.Ill.1983); *Stemler v. Burke*, 344 F.2d 393 (6th Cir.1965). In the exercise of discretion, courts have taken the view that considerations of judicial economy favor consolidation. *See, e.g., Romacho v. Stanley*, 567 F.Supp. 1417, 1419 n. 2 (S.D.N.Y.1983), *aff'd sub nom. Morse v. Stanley*, 732 F.2d 1139 (2d Cir.1984). However, the discretion to consolidate is not unfettered. *Arnold v. Eastern Air Lines, Inc.*, 712 F.2d 899 (4th Cir.1983) (en banc), *cert. denied*, 464 U.S. 1040, 104 S.Ct. 703, 79 L.Ed.2d 168 (1984). Considerations of convenience and economy must yield to a paramount concern for a fair and impartial trial. *Flintkote Co. v. Allis–Chalmers Corp.*, 73 F.R.D. 463 (S.D.N.Y.1977). When exercising its discretion, the court must consider:

> [W]hether the specific risks of prejudice and possible confusion [are] overborne by the risk of inconsistent adjudications of common factual and legal issues, the burden on parties, witnesses, and available judicial resources posed by multiple lawsuits, the length of time required to conclude multiple suits as against a single one, and the relative expense to all concerned of the single-trial, multiple-trial alternatives.

*Hendrix*, 776 F.2d at 1495 (quoting *Arnold*, 681 F.2d at 193). When considering consolidation, a court should also note that the risks of prejudice and confusion may be reduced by the use of cautionary instructions to the jury and verdict sheets outlining the claims of each plaintiff. *Id.*

■ In the instant case, the court properly exercised its discretion in consolidating these two cases for trial. Courts in the Southern and Eastern Districts of New York have used the criteria outlined in an unreported Maryland district court case, *In re All Asbestos Cases Pending in the United States District Court for the District of Maryland*, (D.Md. Dec. 16, 1983) (en banc), (hereinafter *In re Maryland Asbestos Cases* ) as a guideline in determining whether to consolidate asbestos exposure cases. *See, e.g., In re Joint Eastern and Southern Districts Asbestos Litigation*, 125 F.R.D. 60, 64 (E.D.N.Y./S.D.N.Y.1989); *In re Joint Eastern and Southern Districts Asbestos Litigation*, slip op. at 7, 1990 WL 4772 (E.D.N.Y./S.D.N.Y. Jan. 16, 1990). In *In re Maryland Asbestos Cases*, the criteria included: "(1) common worksite; (2) similar occupation; (3) similar time of exposure; (4) type of disease; (5) whether plaintiffs were living or deceased; (6) status of discovery in each case; (7) whether all plaintiffs were represented by the same counsel; and (8) type of cancer alleged...." *In re Maryland Asbestos Cases* at 3. *Johnson* and *Higgins* had the following characteristics: (1) common worksite; (2) similar occupation to the extent that both workers were exposed to asbestos in a bystander capacity (they worked in trades that did not involve direct handling of asbestos products); (3) Johnson's period of exposure was from 1942 to 1945 while Higgins' exposure was from approximately 1946 to 1966; (4) Johnson contended that he suffered from asbestosis and asbestosis-related pleural disease while it was alleged that Higgins died as a result of asbestosis and lung disease; (5) Johnson was living and Higgins was deceased; (6) *Johnson* and *Higgins* were both ready for trial; and (7) all plaintiffs were represented by the same counsel. Instructions were given throughout the trial and in the charge to caution the jury to consider each plaintiff's claims individually. Two separate verdict forms were provided to the jury, one for *Johnson*, the other for *Higgins*.

An appellate court will not disturb a trial court's decision to consolidate unless a clear abuse of discretion is shown. *Hendrix*, 776 F.2d at 1495. In the instant case, the trial court was well within its discretion to consolidate the two cases and the court acted throughout in a manner which ensured that each plaintiff's claim was considered separately.

*Connection Between Plaintiff's Injury and Appellants' Product*

■ In order to succeed on his claim, plaintiff had the burden of proving to the jury that he was exposed to appellants' merchandise and that it is more likely than

not that this exposure was a substantial factor in his injury. *Derdiarian v. Felix Contracting Corp.,* 51 N.Y.2d 308, 434 N.Y.S.2d 166, 414 N.E.2d 666 (1980). Plaintiff had to establish that his injury was proximately caused by appellants' asbestos and produce evidence identifying each appellant's product as being a factor in his injury. *Hymowitz v. Eli Lilly & Co.,* 73 N.Y.2d 487, 541 N.Y.S.2d 941, 539 N.E.2d 1069, *cert. denied,* —— U.S. ——, 110 S.Ct. 350, 107 L.Ed.2d 338 (1989). Plaintiff admits to presenting to the jury "an unusually detailed circumstantial case." Plaintiff contends that by the "cumulative and uncontradicted nature" of the case, the jury was able to conclude not only that there was exposure, but was compelled to come to that result.

Plaintiff worked at the Navy Yard from 1942 to 1945 as an electrician's helper on board ships including the *Missouri,* the *Iowa* and the *Franklin.* Testimony was provided by eleven men who worked at the Navy Yard in various capacities, some during the same time period as Johnson, some before and after plaintiff's employment. Witness James Shannon worked at the Navy Yard from 1940 to 1965 as a plumber's helper and a welder. Shannon recalled working on the *Iowa* at some time between 1940 and 1944 and identified Philip Carey (Celotex) products, including fifty-pound bags of asbestos cement with the words "Philip Carey" written on them, and Owens–Illinois products, including asbestos pipe covering and the brown boxes containing this material both bearing the name "Owens–Illinois," as being in use during that time period on board the *Iowa.* Shannon's testimony indicated that the only two ships he worked on during the time period 1940–1944 were the *North Carolina* and the *Iowa.* He remembered working first on the *North Carolina,* for at least one year and possibly two, before working on the *Iowa.* From his testimony, the jury could infer that he worked on the *Iowa* during the latter part of this time frame which would place Shannon and Johnson on the *Iowa* at the same time.

Several of the witnesses testified as to the close interaction of the different crews working together. Moe Rapchik, a sheet metal worker from 1941 to 1945 who worked on board the *Iowa* in 1942, stated that in the course of his employment he worked with "almost every different crew that the Navy Yard had to offer which was electricians, machinists, shipfitters, pipefitters and asbestos installers." Joint Appendix at 322. Although Rapchik could not recall the specific company names of the products used on board the *Iowa,* he identified Owens–Illinois' Kaylo pipe covering and Celotex's Philip Carey asbestos cement as being in use during the time period 1941 to 1945 and stated that the products installed on the *Iowa* were the same types of products that were installed on every other ship he worked on. Rapchik described the asbestos fibers in general as being "[a]ll over the deck.... We crushed them with our feet as we walked ... and that is how we got it all over our clothes and when we got home at night, we were white all over." Joint Appendix at 329. These descriptions conform to plaintiff's own testimony of working in close, dusty surroundings with other crew members.

Appellants contend that there was insufficient evidence to establish proximate cause and that therefore the case should not have gone to the jury. As an appellate court, we are " 'bound to view the evidence in the light most favorable to [the plaintiff] and to give [him] the benefit of all inferences which the evidence fairly supports, even though contrary inferences might reasonably be drawn.'" *Michelman v. Clark–Schwebel Fiber Glass Corp.,* 534 F.2d 1036, 1042 (2d Cir.) (quoting *Continental Ore Co. v. Union Carbide & Carbon Corp.,* 370 U.S. 690, 696, 82 S.Ct. 1404, 1409, 8 L.Ed.2d 777 (1962)), *cert. denied,* 429 U.S. 885, 97 S.Ct. 236, 50 L.Ed.2d 166 (1976). As the Sixth Circuit noted in *Pratt v. National Distillers & Chemical Corp.,* "We are not to reweigh evidence to reach our own conclusions about the correctness of a jury's decision; our task is simply to determine whether reasonable jurors could, under any theory submitted to them, have resolved the dispute as they did." 853 F.2d 1329, 1337 (6th Cir.1988), *cert. denied,* ——

U.S. ——, 109 S.Ct. 1121, 103 L.Ed.2d 184 (1989). Reviewing the evidence in the light most favorable to the plaintiff, we find that proximate cause existed and that the jury's verdict must be upheld.

*Punitive Damages*

Appellants contend that the Fourteenth Amendment bars the award of punitive damages in this case because subjecting the appellants to repeated punitive damages violates their substantive due process rights. Appellants further maintain that their procedural due process rights were violated by the way in which the punitive damages claim was tried in this case. They also claim that the award of punitive damages was not supported by the evidence as a matter of law.

Appellants argue that the multiple imposition of punitive damages against them for the same course of conduct offends the fundamental fairness inherent in due process. They cite *Browning–Ferris Indus. v. Kelco Disposal, Inc.*, —— U.S. ——, 109 S.Ct. 2909, 2921, 106 L.Ed.2d 219 (1989), where the Supreme Court explicitly refused to consider "whether due process acts as a check on undue jury discretion to award punitive damages in the absence of any express statutory limit" because this question was not before the court. While refraining from addressing this issue directly, the opinions made clear that this question was a substantial one. *Id.* at 2921 n. 23. See also the opinions by Justice Brennan (joined by Justice Marshall), *id.* at 2923–24, and Justice O'Connor (joined by Justice Stevens), *id.* at 2924.

■ This Court recently reviewed the issue of punitive damages in an asbestos-related personal injury action in *Racich v. Celotex Corp.*, 887 F.2d 393. In *Racich*, appellant Celotex contended, *inter alia,* that the plaintiff's claim for punitive damages was not permitted under New York's one-year revival statute, 1986 N.Y.Laws, ch. 682, § 4, and that punitive damages were inappropriate as a matter of New York law and public policy. The Court found Celotex's arguments to be unpersua-

sive. While Celotex raised a substantive due process claim, arguing that multiple imposition of punitive damages for the same course of conduct offended fundamental fairness, the Court did not reach that issue since Celotex did not preserve it for appellate review. *Id.* at 398. In the instant case, the substantive due process claim that multiple imposition of punitive damages for the same course of conduct violated fundamental fairness has been preserved on appeal by only one appellant, Owens–Illinois, who raised this issue in its Memorandum in Support of a Motion for a Judgment Notwithstanding the Verdict. Appellant Celotex failed to raise this due process argument prior to briefing for this appeal. A careful reading of Defendants' Memorandum of Law in Support of Defendants' Motion to Dismiss and for Summary Judgment does not bear out appellant Celotex's contention that this claim was raised. We decline to set aside the punitive damages awarded by the jury since there has been insufficient proof to demonstrate an unjust result of multiple imposition of punitive damages for the same course of conduct.

Appellant Celotex asked this Court to take judicial notice of punitive damages in judgments against them in not only the Southern and Eastern Districts of New York, but in "appeals pending in other cases before this Court, as well as judgments entered in the dockets of the district courts of this and other circuits." Reply Brief for Defendant–Appellant The Celotex Corporation at 14. Appellant Owens–Illinois noted that it advised the trial court of punitive damage awards made, but not paid, in two Southern District cases. Plaintiff contends that substantial portions of the punitive damages assessed have not been paid out by appellants and that in some cases which have been settled or are still on appeal, no punitive damages have been paid at all. Appellants themselves provide no documentation as to exactly how much money they have actually paid in punitive damages.[1] The record here simply

---

1. Owens–Illinois has advised the Court post-argument in this case, that a punitive damage

award in the amount of $554,194.00 was recent-

is insufficient to permit an examination of the claim that there is a multiple award of punitive damages offensive to the fundamental fairness inherent in due process.

As the Court noted in *Racich*, "we do not write upon a clean slate...." 887 F.2d at 399. In *Roginsky v. Richardson–Merrell, Inc.*, 378 F.2d 832, 835 (2d Cir.1967), a claim was made that multiple awards of punitive damages based upon the same course of conduct was a violation of due process. The Court observed that there was "the gravest difficulty in perceiving how claims for punitive damages in such a multiplicity of actions throughout the nation can be so administered as to avoid overkill." *Id.* at 839. The Court concluded, however, that "the New York cases afford no basis for our predicting that the Court of Appeals would adopt a rule disallowing punitive damages in a case such as [*Roginsky*], and the *Erie* doctrine wisely prevents our engaging in such extensive law-making on local tort liability...." *Id.* at 841.

In *Racich*, the Court pointed out that while we did not reject the argument that an award of punitive damages unless governed by precise standards violates due process, we did not accept that argument, "believing that the only course open ... was 'the more modest' task of 'assessing the sufficiency of the evidence within the framework' of New York law." 887 F.2d at 399 (quoting *Roginsky*, 378 F.2d at 841). The Court in *Racich* said:

> [W]e are here asked to hold ... that the commonlaw standards applied by the courts of New York for imposition of punitive damages are unconstitutional, and that our own cases applying that law were in error.... This would be a far-reaching holding indeed, particularly in the context of mass tort litigation that suggests the need for a uniform, national rule on the issue. Under all the circumstances, we believe that such a step, if it is to be taken (and we express no view as to that), is best left for Congress or for higher judicial authority.

ly paid by it in *Passentino v. Raymark Indus.*,

*Id.* (citations omitted). We follow this same course, and leave for another day and a better documented record the question of whether successive awards are violative of due process.

In the instant case, the trial judge informed the jury in his charge that punitive damages may be awarded if plaintiffs "clearly and convincingly established that the acts of a defendant [the jury was] considering causing the injury you [sic] complained of were wanton and reckless." Joint Appendix at 2123. An act was defined as wanton and reckless when "done in such a manner and under such circumstances as to show heedlessness and an utter disregard of the results upon the rights and safety of others that may flow from doing the act, or in the manner in which it is done." *Id.* at 2124. No claim has been made by appellants that this charge was not in accordance with New York law.

■ A review of the evidence shows that the award of punitive damages was supported by the evidence as a matter of law. Plaintiff produced evidence at trial through expert witnesses, medical reports and documents from which the jury could reasonably conclude that appellants acted in a wanton or reckless manner. For example, plaintiff's expert witness testified that a link between asbestos and lung cancer was suspected as early as 1930 and that this link was considered to be probable shortly after 1940. Another expert witness stated in his deposition that by 1942 there were enough cases of the association between lung cancer and asbestos to include this information in a medical textbook on occupational cancer. A former employee of Owens–Illinois testified that workers at a New Jersey plant, including plant executives, wore respirators in the areas of loose raw material including asbestos. The jury was free to conclude from this and other evidence presented that appellants knew of the dangers of asbestos and did not adequately protect or warn users of asbestos, thereby acting in a wanton or reckless manner.

CV–87–5019 (S.D.N.Y.).

Appellants further maintain that their procedural due process rights were violated by the manner in which the punitive damages claim was tried. Owens–Illinois specifically contends that the consolidation of *Johnson* and *Higgins* and the failure to erect procedural safeguards during the consolidated trial violated appellants' due process rights. Since we have found the consolidation was not an abuse of discretion, and since the trial judge carefully instructed the jury throughout the trial to consider each plaintiff's claims individually, there was no need to provide other procedural safeguards concerning the consolidation.

■ Owens–Illinois admits that it never specifically made a request for bifurcation of the damages aspect of the punitive damages claim, but argues that it did make a motion to bifurcate the entire punitive damages claim as well as a motion to trifurcate all triable issues. Appellant further argues that the trial judge granted bifurcation in a previous asbestos-related personal injury case. Plaintiff contends that the trial court invited appellants to bifurcate the damages aspect of the punitive damages claim and that appellants made a tactical decision not to give the jury two separate opportunities to assess damages against them. Regardless of appellants' motives in fashioning a motion for bifurcation, the fact that bifurcation did not occur is not necessarily prejudicial to appellants. The decision to bifurcate is within the discretion of the trial judge. *In re Master Key Antitrust Litigation*, 528 F.2d 5, 14 (2d Cir.1975). The fact that a previous case tried by the same judge was bifurcated has no bearing on the instant case.

### Conduct of the Court and Counsel

Appellants contend that improper conduct of the trial court and inflammatory conduct by plaintiff's counsel during summation denied them a fair and impartial trial.

Owens–Illinois alleges specifically that counsel described witnesses as "liar[s]",

"sleaze" and "clown[s]." Appellants contend they were prejudiced both by counsel's use of the words "evil" and "vicious" to describe them, and counsel's characterization of appellants' defense as "obscene", "ugly" and "ridiculous." Appellants also complain of counsel's invocation of the "Golden Rule" (do unto others as you would have them do unto you) and the use of a strategy that included an appeal to class prejudice. This Court finds that counsel's behavior did not rise to the level of denying appellants a fair and impartial trial.

■ Throughout the normal course of the trial and in his final charge, the trial judge instructed the jury to decide the case in a rational manner based on the evidence presented and not on emotions, sympathy, prejudice, or bias. In denying appellants' motion for mistrial, the trial judge determined that none of the derogatory descriptive statements complained of was so inflammatory as to require a new trial. The court found that all but two of the counsel's alleged appeals to the Golden Rule argument related to liability only and not damages and were therefore not improper. *Burrage v. Harrell*, 537 F.2d 837 (5th Cir. 1976). The remaining two instances were determined to be of a nature that would not unduly affect the jury in light of the judge's charge. The appeal to class prejudice was found to be of a class of remarks which are not per se grounds for a new trial and in the context of the entire summation, did not create undue passion. We agree. Great discretion is to be given the judge who was present throughout the trial and is best able to determine the effect of the conduct of counsel on the jury. *Arnold*, 681 F.2d at 194.

Appellants contend that the trial judge failed to control the behavior of plaintiff's counsel and that the judge himself contributed to an atmosphere not conducive to fair play by questioning the plaintiff and coaching his answers. Celotex points specifically to two exchanges between the judge and the plaintiff.[2]

---

2. The judge asked Mr. Johnson "to remember  what it was like back then and select the words

The trial judge also brought to the attention of all counsel that he had heard testimony of one of appellants' expert witnesses in a previous case and had found the witness to be less than credible. One defense counsel expressed concern that the judge could sit fairly on the instant case and stated that the judge had been acting in an uncomplimentary manner throughout the witness' testimony. The judge denied defense counsel's characterization of his manner during the testimony.

■ It is well settled that a judge is authorized to ask questions of a witness which may aid the understanding of the jury. *United States v. Lamont*, 565 F.2d 212, 220 (2d Cir.1977) *cert. denied*, 435 U.S. 914, 98 S.Ct. 1467, 55 L.Ed.2d 505 (1978). In the instant case, Mr. Johnson has been described by his counsel and an expert appellant witness as a man of few words. It would appear then, that the judge was merely attempting to clarify matters that seemed to call for further explanation, as the judge told the jury in his charge.

As to the manner of the judge throughout the testimony of the expert witness, we are satisfied that his instructions to the jury cured even the appearance of any impropriety.[3] *United States v. Robinson*, 635 F.2d 981, 985 (2d Cir.1980), *cert. denied*, 451 U.S. 992, 101 S.Ct. 2333, 68 L.Ed.2d 852 (1981).

## CONCLUSION

For the above-stated reasons the judgment of the district court is affirmed.

MAHONEY, Circuit Judge, concurring in part and dissenting in part:

I agree with the majority that the district court's decision to consolidate *Higgins* and *Johnson* was a permissible exercise of discretion, that a reasonable jury could find a causal connection between appellants' products and plaintiff's injury, and that there is no basis for reversal in the conduct of the trial court and plaintiff's counsel. I respectfully dissent, however, from the majority's conclusion that punitive damages are adequately supported by the evidentiary record, and would reverse the award of punitive damages as a matter of law. I accordingly would not reach, and do not join the majority's consideration of, appellants' constitutional objections to the imposition of punitive damages.

---

that will describe it sufficiently so that these people here, who weren't there, can, in their minds, have some idea of what you saw." The judge then went on to question Mr. Johnson about what his work site looked like. Joint Appendix at 15.

In another instance, after plaintiff had described his feelings when learning of the results of his x-ray, the judge engaged Mr. Johnson in the following colloquy:

THE COURT: Before you go on, since the jury is going to have to make some decisions on this, I think we ought to get a little more on this than we have. When you talked to Doctor Spinnato in December, he said go and have the CAT scan and pulmonary function test.

I imagine you had some reaction to what he said to you.

THE WITNESS: He just said he seen [sic] some spots on the X-ray.

THE COURT: Did you react to that or no?

THE WITNESS: I didn't know what to think. I didn't know what was wrong.

THE COURT: Let me suggest some words to you over a different range and tell me if those—if any of these is an adequate explanation of what you were feeling.

These are a whole bunch of alternatives not meant to suggest that any one is appropriate.

. . . .

. . . The question is whether any of these words, if any of these are appropriate. If none are appropriate, tell me.

A reaction of calm, resigned, depressed, scared, are any of those appropriate?

THE WITNESS: Depressed and scared.

Joint Appendix at 31–32.

3. The judge stated:

Now, I don't reach a determination myself or express any opinion as to how you should decide the facts of the case; that's your function. That's why we have jurors.

It's not my function to decide any of the facts in the case, and I haven't expressed, nor have I intended to convey any view as to how the facts are to be decided; as to which witnesses are or aren't worthy of belief; as to what facts are or are not established; or as to what inferences ought to be drawn from the evidence.

If any expression of mine during the course of this trial has seemed to indicate an opinion regarding any of these matters, I instruct you to disregard that expression entirely.

Joint Appendix at 2084.

Our tort law system reserves punitive damages for those extraordinary cases where an extra measure of payment—beyond full compensation for injuries—is thought to be necessary "for the purpose of punishing the defendant, of teaching the defendant not to do it again, and of deterring others from following the defendant's example." W. Keeton, D. Dobbs, R. Keeton & D. Owen, Prosser and Keeton on the Law of Torts § 2, at 9 (5th ed. 1984). Thus, for example, punitive damages may be deemed appropriate where a defendant, while not intending to injure a plaintiff, exhibits "such a conscious and deliberate disregard of the interests of others that his conduct may be called wilful or wanton." *Id.* at 10. The case before us involves an application of that theory.

As the majority notes, the district court's jury instruction required a determination that defendant's conduct was "wanton or reckless" to sustain an award of punitive damages, and this is a correct statement of New York law. As we have said, however, in another diversity case where we undertook a thorough review of the applicable New York precedents, New York law contemplates that "the recklessness that will give rise to punitive damages must be close to criminality, see 14 N.Y.Jur., Damages § 181 p. 41, and ..., like criminal conduct, it must be 'clearly established.'" *Roginsky v. Richardson–Merrill, Inc.,* 378 F.2d 832, 843 (2d Cir.1967) (Friendly, J.). We went on to quote, *id.,* the definition in N.Y.Penal Law § 15.05(3) (McKinney 1987), since unchanged, as setting forth New York's view of recklessness. Section 15.-05(3) provides in pertinent part:

> A person acts recklessly with respect to a result ... when he is aware of and consciously disregards a substantial and unjustifiable risk that such result will occur.... The risk must be of such nature and degree that disregard thereof constitutes a gross deviation from the standard of conduct that a reasonable person would observe in the situation.

I do not regard the evidence in this case as adequate for submission of punitive damages to the jury under these standards. The evidence at trial established that dur-

ing the time Johnson worked in the Brooklyn Navy Yard, appellants were aware that the properties of asbestos were such that it could, at some level of exposure, injure a human being. From this, it is possible reasonably to conclude that appellants had a duty to warn or otherwise safeguard persons such as Johnson, and must now compensate him for whatever injuries are attributable to their failure to do so. The award of compensatory damages is therefore sustainable, even though Johnson never worked in an asbestos plant, and did not work directly with asbestos-containing products in the Brooklyn Navy Yard. In the circumstances, the jury did not exceed its authority in determining that appellants should have known that Johnson, and others similarly situated, were being put at risk.

Punitive damages, however, are not properly chargeable against a defendant who merely "should have known" of the risk in question. It must be shown that the defendant was aware of the risk, and that he consciously disregarded it. *See Roginsky,* 378 F.2d at 843 (punitive damages proper where manufacturer shown "to have become aware of danger and to have done nothing, deliberately closing its eyes"). There has been no such showing here. All the evidence to which Johnson directs us relates to actions, correspondence and literature concerning asbestos processing plants, where workers had direct and sustained exposure to high concentration levels of asbestos fibers. This record contains *no* evidence that either medical researchers or asbestos manufacturers possessed, in the mid 1940s, information establishing, or even predicting, that "bystanders" might experience unsafe levels of exposure in shipyards where finished hardbound insulation products containing asbestos were in use. The award of punitive damages is, therefore, in my view unsustainable.

The majority reasons that the jury could conclude, on this record, "that appellants knew of the dangers of asbestos and did not adequately protect or warn users of asbestos, thereby acting in a wanton or reckless manner." The majority paints

**1292**

with much too broad a brush, as I see it, in its reference to "the dangers of asbestos."

The clear implication is that once a product is shown to be dangerous to some persons under some circumstances, punitive damages can be awarded against a manufacturer who fails to anticipate its subsequently discovered propensity to endanger other persons in markedly different circumstances. This is hardly the "recklessness" ... close to criminality" which we described in *Roginsky* as the standard for awarding punitive damages under New York law. As Judge Friendly there said, "error in failing to make what hindsight demonstrates to have been the proper response—even 'gross' error—is not enough to warrant submission of punitive damages to the jury." 378 F.2d at 843.

I therefore respectfully dissent from the majority's affirmance of the jury's awards of punitive damages.